UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| HARRY H. JOHNSON III, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. _____ |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
|     Defendant. | ) |

## COMPLAINT

Harry H. Johnson, III ("Plaintiff"), by counsel, for his cause of action against Defendant United States of America ("Defendant"), states the following:

### Jurisdiction and Venue

1. This action arises under the Federal Tort Claims Act of 1948, 62 Stat. 982, 28 U.S.C. §§ 1346(b) and 2671, et seq.

2. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

3. In compliance with 28 U.S.C. § 2675, Plaintiff filed his notice of administrative claim with the appropriate administrative agency—the Department of Veterans Affairs (the "VA")—on March 16, 2016.

4. To date this claim has not been denied by the VA Office of Chief Counsel. However, the VA has been investigating the tort claim for over a year and as such, the claim has been constructively denied.

-1-

5. Accordingly, Plaintiff's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

6. Plaintiff is a legal resident of Owensville, Missouri in Gasconade County.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the injury complained of occurred at the Harry S. Truman Memorial Veterans Hospital located in Columbia, Missouri ("Columbia VAMC"), and thus, the cause of action arose within the Western District of Missouri.

## General Allegations

8. At all times relevant to this action, Plaintiff resided within the State of Missouri.

9. At all times relevant to this action, Defendant owned and operated the Columbia VAMC.

10. At all times mentioned herein, the agents, servants, and employees of Defendant were acting within the course and scope of their agency.

11. From March 2011 through April 2012, Plaintiff was treated at the University of Missouri Health System for his complaints of shoulder pain.

12. On April 10, 2012, an ultrasound was taken. Providers noted that the findings were consistent with thoracic outlet compression/obstruction, and Plaintiff was advised to schedule a vascular surgery consultation.

13. Mr. Johnson began to receive care and treatment at the Harry S. Truman Memorial Veterans' Hospital in Columbia, Missouri ("Columbia VAMC") in early 2014.

14. Plaintiff was evaluated by George Parkins, M.D. ("Dr. Parkins"), an orthopedic surgeon, on February 20, 2014 at the Columbia VAMC.

15. Dr. Parkins performed an evaluation of Plaintiff's right shoulder and ordered an EMG to evaluate the symptoms of progressive numbness the patient was experiencing.

16. Plaintiff was evaluated by Matthew Smith, M.D., a physician at the University of Missouri, on March 27, 2014, as a follow-up for his thoracic outlet syndrome symptoms.

17. During this visit, Plaintiff reported continuing symptoms of right arm numbness and weakness with overhead activities and noted that these symptoms had increased to the point that his right arm would become numb while driving.

18. Plaintiff returned to the Columbia VAMC on April 14, 2014 for a physical medicine and rehabilitation consultation. During this visit, Plaintiff underwent an EMG.

19. The results of the EMG showed electrophysiologic evidence for mild right median neuropathy at the wrist (carpal tunnel syndrome), but no electrophysiologic evidence for right cervical radiculopathy, right ulnar neuropathy or neurogenic thoracic outlet syndrome.

20. On June 23, 2014, Plaintiff was evaluated at a thoracic surgery outpatient appointment by Andrew Rich, M.D. ("Dr. Rich") at the Columbia VAMC. Dr. Rich noted that Plaintiff was experiencing an exacerbation of the symptoms in his right hand, becoming numb when the arm was elevated to 90 degrees.

21. Despite the findings reported by the EMG, Dr. Rich noted that Plaintiff was "with likely TOS with vascular compromise right more than left."

22. Dr. Rich ordered a CT of Plaintiff's chest to rule out a tumor and Plaintiff was advised to return to the clinic in one week.

23. The CT of Plaintiff's chest was performed on June 26, 2014 by Rafael Marroquin, M.D. ("Dr. Marroquin"). Dr. Marroquin documented that there was "[n]o evidence of an apparent anatomic abnormality to result in thoracic outlet syndrome."

24. On June 30, 2014, Plaintiff was evaluated by Normand Caron, M.D. ("Dr. Caron") for an outpatient thoracic surgery appointment.

25. Dr. Caron documented Plaintiff's complaints of pain and numbness when his right arm was overhead. He documented that Plaintiff had received a CT scan, and EMG and nerve conduction studies.

26. Dr. Caron noted that Plaintiff's EMG and nerve conduction studies did not show any evidence for thoracic outlet syndrome.

27. Dr. Caron's physical examination of the patient revealed a loss of right radial pulse on hyperextension of the right arm with Adson's maneuver.

28. Dr. Caron noted that it was his assessment that "clinically, he has TOS, but this is difficult to demonstrate objectively." He recommended that Plaintiff proceed with right axillary first rib resection and anterior scalenectomy.

29. On July 21, 2014, Plaintiff underwent a right transaxillary first rib resection with division of the anterior scalene muscle, and neurolysis of the brachial plexus. The

procedure was performed by Dr. Caron and Siddharth Kudav, M.D. ("Dr. Kudav"), a medical resident.

30. The operative note documented again that the EMG and nerve conduction studies "do not really show any obvious delayed conduction or problems with muscle function."

31. The operative note additionally documented that there were complications with the procedure. Under the "Findings" section, surgeons Dr. Caron and Dr. Kudav noted that there was a "major drawback" as "multiple bone cutters were used before I finally was able to cut the bone. This took multiple attempts times and even a Gigli saw was required to divide the rib in half at first before being able to resect the bone. The bone resection required multiple attempts until finally a sharp bone cutter was used, and this worked well."

32. Under "Description of procedure," Drs. Caron and Kudav noted additional complications with the procedure. They documented "However, the biggest problem was dividing the rib in half. The initial bone cutters would not work and even only power-saws were available and it was not safe to use power-saws in this area. A Gigli saw was eventually used which actually worked and was able to divide the rib in half."

33. The surgeons documented "With the posterior half of the rib still remaining, the periosteal elevator was again used to remove all the periosteum from the rib all the way down towards the transverse process. This could be visualized well enough and care was taken to avoid any pressure on the brachial plexus. However, the space was very narrow because of the patient's habitus and the rib was taken down all the

-5-

Case 2:17-cv-04081-NKL   Document 1   Filed 05/18/17   Page 5 of 14

way up towards the transverse process and then a rib cutter was again used to divide the rib in this area."

34.     The surgeons encountered additional complications when it came to cutting the rib at that juncture. They documented, "Again this took multiple attempts to find a rib cutter that was actually sharp enough and able to cut the rib."

35.     Upon waking from anesthesia, Plaintiff noticed that his pinky and thumb were numb.

36.     Plaintiff's complaints of pinky and thumb numbness were documented by Bethany Harmon, R.N. The progress note authored by this provider additionally noted that Dr. Caron was made aware of these findings.

37.     Plaintiff was assessed by Angela Schultz, R.N. ("Ms. Schultz") at 11:24 PM. Ms. Schultz noted that Plaintiff's sensation was intact "except numbness right fifth digit extending up forearm." Again, she documented that Dr. Caron was aware of Plaintiff's complaints.

38.     The following day, Plaintiff was transferred to the unit from the ICU. Earlene Anderson, R.N. documented that upon his arrival to the unit, Plaintiff reported numbness of his right pinky, thumb, and anterior forearm. A neurology consultation was ordered.

39.     Bharath Yarlagadda, M.D. ("Dr. Yarlagadda") and Scott Lucchese, M.D. ("Dr. Lucchese") performed the neurology consultation on July 22, 2014. These providers noted that, as soon as Plaintiff woke up from surgery on July 21, 2014, he

complained of numbness of his right little finger, the medial aspect of the palm, and the medial aspect of the right forearm.

40. Upon their physical examination, Drs. Yarlagadda and Lucchese noted that Plaintiff's strength was 4/5 in the right upper extremity limited by pain. He could not make a fist on the right side, "gives away at the little finger," and could not abduct the little finger under pressure." The providers noted that Plaintiff was experiencing sensory and motor deficits in the ulnar nerve distribution and that these symptoms would most likely take "a couple of weeks to get better."

41. Providers went on to note that a follow-up in clinic with an EMG would take place if the symptoms did not resolve in 4-6 weeks.

42. On July 23, 2014, Drs. Yarlagadda and Lucchese again evaluated Plaintiff. Their physical examination and assessment of the patient remained the same.

43. Dr. Lucchese entered an addendum to the neurology consultation report dated July 22, 2014 on July 23. He noted that Plaintiff had some mild weakness in the flexor carpi radialis, flexor digitorum profundus, first dorsal interosseous, second dorsal interosseous, and abductor digiti minimi, but did not have a wrist drop.

44. He documented that Plaintiff had sensory loss predominantly in the ulnar distribution of the hand, with some loss of sensation on the medial forearm. Dr. Lucchese documented that the symptoms could fit with "medial cutaneous nerve of the forearm. The best localization I can give at this point is a medial cord of the brachial plexus."

45. Additionally, Dr. Lucchese documented that the "most likely etiology would be mechanical irritation probably during the surgery."

46. Plaintiff was discharged home on July 23, 2014. The discharge summary noted that he did complain of numbness and weakness in the right hand and elbow worse than prior to surgery and more constant in nature.

47. On July 26, 2014, Plaintiff reported to the Emergency Department of the Phelps County Regional Medical Center for right arm discoloration. Plaintiff was evaluated by Joaquin Guzon, M.D. ("Dr. Guzon").

48. Dr. Guzon noted Plaintiff's complaints of right upper extremity discoloration, lack of strength in the right arm, and numbness in the right hand. Dr. Guzon additionally noted that Plaintiff believed that the swelling in his chest and arm had increased.

49. Dr. Guzon ordered an upper extremity venous Doppler to rule out deep vein thrombophlebitis ("DVT"). No evidence of DVT was found and Plaintiff was discharged home. He was told to follow-up at the VA within one week.

50. Plaintiff returned to the VA on August 11, 2014 for a thoracic surgery follow-up visit, where he was evaluated by John Markley, M.D. ("Dr. Markley"). Dr. Markley documented Plaintiff's complaints of numbness and weakness in his right hand, noting that the patient could not use a knife and fork, and had no grip strength. Plaintiff was additionally experiencing pain at a "6" on a 0 to 10 scale.

51. Dr. Markley ordered PT/OT for Plaintiff and instructed him to keep his upcoming appointment with neurology.

52. Plaintiff began physical therapy at the VAMC on August 21, 2014. Dipti Patel, P.T. documented that Plaintiff was experiencing decreased range of motion of the right shoulder compared to the left, decreased strength of the right rotator cuff muscles, weakness in the right hand muscles distribution, and mild tightness in the right third and fourth lumbricals. Plaintiff was issued an oval 8 ring to prevent contractures, several exercises with written handouts, theraputty, and an overhead pulley. A consultation was placed for non-VA care near Plaintiff's home. He was instructed to attend therapy once per week for four weeks.

53. On September 10, 2014, Plaintiff attended an occupational therapy consultation with Kimberly Hickey, O.T. During the evaluation, Plaintiff reported swelling if his right hand was not elevated, and "numbness in my whole arm but I have no feeling." Mild edema was noted in the right index and middle digits upon objective assessment. Plaintiff was issued and fitted with a right small over-wrist isotoner glove.

54. Plaintiff returned to the Columbia VAMC for a neurology consultation on September 12, 2014. He was evaluated by Dr. Lucchese and Jagkirat Singh, M.D. ("Dr. Singh"). Drs. Lucchese and Singh noted that Plaintiff reported no change since his last visit and that he was having difficulty working at his book binding company.

55. Upon physical examination, these physicians noted that Plaintiff had lost sensation to fine and crude touch on the medial two fingers of his right hand, both dorsal and ventral. They noted that while proprioception was intact, the motor power was 3/5 for flexors and extensors of the left wrist.

56. Providers documented their belief that the root of the brachial plexus was effected, and that an EMG would be performed to figure out the exact lesion.

57. An electro-diagnostic nerve conduction study was performed on October 6, 2014 by Carl Giacchi ("Mr. Giacchi"). Mr. Giacchi noted that Plaintiff's fingers were starting to curl, and that he had no feeling in the fifth finger and no grip strength.

58. The findings of the electromyography included: "abnormal right median motor amplitude with normal distal latency and conduction velocity; abnormal right ulnar motor amplitude with normal distal latency and conduction velocity; abnormal right ulnar F-wave delayed; abnormal right axillary loop delayed; absent right ulnar sensory peak latency and amplitude to the fifth finger; abnormal right medial antebrachial cutaneous peak latency with normal amplitude at the forearm; and abnormal EMG of right upper extremities showing fibrillation potentials, positive waves and decreased recruitment in C8-T1 distb nerves."

59. The impression was noted as an abnormal study with electrophysiologic evidence of a right brachialplexopathy affecting the lower trunk and C8-T1 innervated muscles. These findings were noted as "new findings compared to previous EMG."

## Count One: Negligence

60. Plaintiff re-alleges and restates paragraphs 1 through 59 as if fully stated herein.

61. At all times relevant to this action, the agents, servants, employees, and personnel of the Defendant United State of America were acting within the course and

scope of their employment in providing medical care and treatment to Mr. Johnson, a veteran of the United States Armed Forces entitled to such care and treatment.

62. On July 21, 2014, the surgical team at the Columbia VAMC owed Mr. Johnson a duty to provide him with medical care and treatment consistent with the governing standards of medical care.

63. The surgical team owed Mr. Johnson a duty to perform the procedure within the standard of care.

64. In particular, as the surgeons, Drs. Kudav and Caron owed Mr. Johnson a duty to select the appropriate tools for the procedure and ensure that these tools were available for use.

65. The surgical team, in particular Drs. Kudav and Caron, and the Columbia VAMC deviated from appropriate standards of medical care in providing medical care and treatment to Mr. Johnson in the following respects:

   a. Negligent misdiagnosis of thoracic outlet syndrome;

   b. Negligent recommendation of the right rib resection procedure that was unnecessary for the patient;

   c. Negligent performance of the right rib resection procedure on July 21, 2014;

   d. Negligent failure to have the appropriate equipment and tools available in the operating room, including, but not limited to, a properly maintained variety of cutting tools required for thoracic surgery;

-11-

Case 2:17-cv-04081-NKL    Document 1    Filed 05/18/17    Page 11 of 14

    e. Negligent failure to postpone and/or cancel the July 21, 2014 surgery due to the unavailability of appropriate and properly maintained cutting tools;

    f. Negligent selection of the Gigli saw as the bone cutting tool used in the procedure;

    g. Negligent failure to timely diagnose and treat the injuries relating to the surgery; and

    h. Committing other negligent acts and/or omissions in violation of the applicable standards of medical care that may be revealed through additional factual investigation, expert review, and/or discovery.

66. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson was caused to suffer physical injury, pain, mental anguish, and permanent physical disability. He has additionally incurred economic damages as a result of the injury and his disability.

67. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson suffered an ulnar nerve injury.

68. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson has suffered the following injuries:

    a. Permanent loss of use of the right lower extremity;

    b. The need for additional medical intervention;

  c. Permanent loss of sensation to fine touch in the right lower extremity;

  d. Permanent loss of sensation to crude touch in the right lower extremity;

  e. Permanent curling of and other deformity to the right lower extremity;

  f. Permanent numbness to the right upper extremity;

  g. Permanent muscle atrophy in the intrinsic muscles of the right hand and right forearm;

  h. Permanent loss of grip strength in the right hand; and

  i. Permanent nerve injury.

69. These injuries have affected Mr. Johnson's ability to perform activities of daily life, remain employed in his field of employment, and have caused a significant decrease in his overall quality of life.

70. Accordingly, Mr. Johnson claims the following damages:

  a. Compensation for the physical injury and disability suffered by Mr. Johnson;

  b. Compensation for the extreme pain, suffering, and mental anguish of Mr. Johnson;

  c. Compensation for economic losses sustained as a result of Mr. Johnson's injury;

  d. Compensation for Mr. Johnson's loss of enjoyment of life;

  e. Compensation for past and future medical expenses; and

  f. Compensation for any other damages sustained by Mr. Johnson as a proximate result of the Defendant's negligent acts.

71. For these damages, Plaintiff demands $5,000,000.00 (Five Million and 00/100 Dollars) in compensation.

72. Pursuant to Missouri Revised Statutes § 538.225, the written opinion of a legally qualified healthcare provider has been obtained in support of this case. The affidavit of counsel is attached hereto as **EXHIBIT A** and is incorporated herein by reference.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor against Defendant as prayed for above and award him such other further relief as is just and equitable under the circumstances.

Respectfully Submitted,

HARRY H. JOHNSON III

By: /s/Tim Van Ronzelen
Tim Van Ronzelen   #44382
Cook, Vetter, Doerhoff & Landwehr, P.C.
231 Madison Street
Jefferson City, MO 65101
(573) 635-7977 ext. 110
(573) 635-7414 – Facsimile
tvanronzelen@cvdl.net