UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| HARRY H. JOHNSON III, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case 2:17-cv-04081-NKL |
| | ) |
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Defendant. | ) |

## AMENDED COMPLAINT

Plaintiff Harry H. Johnson, III ("Mr. Johnson"), by counsel, for his cause of action against Defendant United States of America ("Defendant"), states the following:

### Jurisdiction and Venue

1. This action arises under the Federal Tort Claims Act of 1948, 62 Stat. 982, 28 U.S.C. §§ 1346(b) and 2671, et seq.

2. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

3. In compliance with 28 U.S.C. § 2675, Mr. Johnson filed his notice of administrative claim with the appropriate administrative agency—the Department of Veterans Affairs (the "VA")—on March 16, 2016.

4. To date this claim has not been denied by the VA Office of Chief Counsel. However, the VA has been afforded the opportunity to investigate the tort claim for over a year and, as such, the claim has been constructively denied.

5. Accordingly, Mr. Johnson's claim is ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

-1-

Case 2:17-cv-04081-NKL   Document 11   Filed 07/07/17   Page 1 of 15

6. Mr. Johnson is a legal resident of Owensville, Missouri in Gasconade County.

7. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the injury complained of occurred at the Harry S. Truman Memorial Veterans Hospital located in Columbia, Missouri ("Columbia VAMC"), and thus, the cause of action arose within the Western District of Missouri.

## General Allegations

8. At all times relevant to this action, Mr. Johnson resided within the State of Missouri.

9. At all times relevant to this action, Defendant owned and operated the Columbia VAMC.

10. At all times mentioned herein, the agents, servants, and employees of Defendant were acting within the course and scope of their agency.

11. From March 2011 through April 2012, Mr. Johnson was treated at the University of Missouri Health System for his complaints of shoulder pain.

12. On April 10, 2012, an ultrasound was taken. Providers noted that the findings were consistent with thoracic outlet compression/obstruction, and Mr. Johnson was advised to schedule a vascular surgery consultation.

13. Mr. Johnson began to receive care and treatment at the Columbia VAMC in early 2014.

14. Mr. Johnson was evaluated by George Parkins, M.D. ("Dr. Parkins"), an orthopedic surgeon, on February 20, 2014 at the Columbia VAMC.

15. Dr. Parkins performed an evaluation of Mr. Johnson's right shoulder and ordered an EMG to evaluate the symptoms of progressive numbness the patient was experiencing.

-2-

Case 2:17-cv-04081-NKL   Document 11   Filed 07/07/17   Page 2 of 15

16. Mr. Johnson was evaluated by Matthew Smith, M.D., a physician at the University of Missouri, on March 27, 2014, as a follow-up for his thoracic outlet syndrome symptoms.

17. During this visit, Mr. Johnson reported continuing symptoms of right arm numbness and weakness with overhead activities and noted that these symptoms had increased to the point that his right arm would become numb while driving.

18. Mr. Johnson returned to the Columbia VAMC on April 14, 2014 for a physical medicine and rehabilitation consultation. During this visit, Mr. Johnson underwent an EMG.

19. The results of the EMG showed electrophysiologic evidence for mild right median neuropathy at the wrist (carpal tunnel syndrome), but no electrophysiologic evidence for right cervical radiculopathy, right ulnar neuropathy or neurogenic thoracic outlet syndrome.

20. On June 23, 2014, Mr. Johnson was evaluated at a thoracic surgery outpatient appointment by Andrew Rich, M.D. ("Dr. Rich") at the Columbia VAMC. Dr. Rich noted that Mr. Johnson was experiencing an exacerbation of the symptoms in his right hand, becoming numb when the arm was elevated to 90 degrees.

21. Despite the findings reported by the EMG, Dr. Rich noted that Mr. Johnson was experiencing "likely TOS with vascular compromise right more than left."

22. Dr. Rich ordered a CT of Mr. Johnson's chest to rule out a tumor, and Mr. Johnson was advised to return to the clinic in one week.

23. The CT of Mr. Johnson's chest was performed on June 26, 2014 by Rafael Marroquin, M.D. ("Dr. Marroquin"). Dr. Marroquin documented that there was "[n]o evidence of an apparent anatomic abnormality to result in thoracic outlet syndrome."

24. On June 30, 2014, Mr. Johnson was evaluated by Normand Caron, M.D. ("Dr. Caron") for an outpatient thoracic surgery appointment.

25. Dr. Caron documented Mr. Johnson's complaints of pain and numbness when his right arm was overhead. He documented that Mr. Johnson had received a CT scan, and EMG and nerve conduction studies.

26. Dr. Caron noted that Mr. Johnson's EMG and nerve conduction studies did not show any evidence for thoracic outlet syndrome.

27. Dr. Caron's physical examination of the patient revealed a loss of right radial pulse on hyperextension of the right arm with Adson's maneuver.

28. Dr. Caron noted that it was his assessment that "clinically, he has TOS, but this is difficult to demonstrate objectively." He recommended that Mr. Johnson proceed with right axillary first rib resection and anterior scalenectomy.

29. Mr. Johnson did not, in fact, suffer from thoracic outlet syndrome.

30. On July 21, 2014, Mr. Johnson underwent a right transaxillary first rib resection with division of the anterior scalene muscle, and neurolysis of the brachial plexus. The procedure was performed by Dr. Caron and Siddharth Kudav, M.D. ("Dr. Kudav"), a medical resident.

31. The operative note documented again that the EMG and nerve conduction studies "do not really show any obvious delayed conduction or problems with muscle function."

32. The operative note additionally documented that there were complications with the procedure.

33. Under the "Findings" section, surgeons Dr. Caron and Dr. Kudav noted that there was a "major drawback" as "multiple bone cutters were used before I finally was able to cut the bone. This took multiple attempts times and even a Gigli saw was required to divide the rib in half at first before being able to resect the bone. The bone resection required multiple attempts until finally a sharp bone cutter was used, and this worked well."

-4-

Case 2:17-cv-04081-NKL   Document 11   Filed 07/07/17   Page 4 of 15

34. Under "Description of procedure," Drs. Caron and Kudav noted additional complications with the procedure. They documented "However, the biggest problem was dividing the rib in half. The initial bone cutters would not work and even only power-saws were available and it was not safe to use power-saws in this area. A Gigli saw was eventually used which actually worked and was able to divide the rib in half."

35. The surgeons documented "With the posterior half of the rib still remaining, the periosteal elevator was again used to remove all the periosteum from the rib all the way down towards the transverse process. This could be visualized well enough and care was taken to avoid any pressure on the brachial plexus. However, the space was very narrow because of the patient's habitus and the rib was taken down all the way up towards the transverse process and then a rib cutter was again used to divide the rib in this area."

36. The surgeons encountered additional complications when it came to cutting the rib at that juncture. They documented, "Again this took multiple attempts to find a rib cutter that was actually sharp enough and able to cut the rib."

37. Upon waking from anesthesia, Mr. Johnson noticed that his pinky and thumb were numb.

38. Mr. Johnson's complaints of pinky and thumb numbness were documented by Bethany Harmon, R.N. The progress note authored by this provider additionally noted that Dr. Caron was made aware of these findings.

39. Mr. Johnson was assessed by Angela Schultz, R.N. ("Ms. Schultz") at 11:24 PM on July 21, 2014. Ms. Schultz noted that Mr. Johnson's sensation was intact "except numbness right fifth digit extending up forearm." Again, she documented that Dr. Caron was aware of Mr. Johnson's complaints.

-5-

Case 2:17-cv-04081-NKL   Document 11   Filed 07/07/17   Page 5 of 15

40. The following day, on July 22, 2014, Mr. Johnson was transferred to the unit from the ICU at the Columbia VAMC.

41. Earlene Anderson, R.N. documented that upon his arrival to the unit, Mr. Johnson reported numbness of his right pinky, thumb, and anterior forearm. A neurology consultation was ordered.

42. Bharath Yarlagadda, M.D. ("Dr. Yarlagadda") and Scott Lucchese, M.D. ("Dr. Lucchese") performed the neurology consultation on July 22, 2014 at the Columbia VAMC. These providers noted that, as soon as Mr. Johnson woke up from surgery on July 21, 2014, he complained of numbness of his right little finger, the medial aspect of the palm, and the medial aspect of the right forearm.

43. Upon their physical examination, Drs. Yarlagadda and Lucchese noted that Mr. Johnson's strength was 4/5 in the right upper extremity limited by pain. They noted that Mr. Johnson could not make a fist on the right side, "gives away at the little finger," and could not abduct the little finger under pressure.

44. The providers noted that Mr. Johnson was experiencing sensory and motor deficits in the ulnar nerve distribution and that these symptoms would most likely take "a couple of weeks to get better."

45. Providers went on to note that a follow-up in clinic with an EMG would take place if the symptoms did not resolve in four to six weeks.

46. On July 23, 2014, Drs. Yarlagadda and Lucchese again evaluated Mr. Johnson. Their physical examination and assessment of the patient remained the same, as Mr. Johnson's sensory and motor deficits had not resolved.

47. Dr. Lucchese entered an addendum to the neurology consultation report dated July 22, 2014 on July 23. He noted that Mr. Johnson had some mild weakness in the flexor carpi radialis, flexor digitorum profundus, first dorsal interosseous, second dorsal interosseous, and abductor digiti minimi, but did not have a wrist drop.

48. Dr. Lucchese documented that Mr. Johnson had sensory loss predominantly in the ulnar distribution of the hand, with some loss of sensation on the medial forearm. Dr. Lucchese documented that the symptoms could fit with "medial cutaneous nerve of the forearm. The best localization I can give at this point is a medial cord of the brachial plexus."

49. Additionally, Dr. Lucchese documented that the "most likely etiology would be mechanical irritation probably during the surgery."

50. Mr. Johnson was discharged home on July 23, 2014. The discharge summary noted that he did complain of numbness and weakness in the right hand and elbow worse than prior to surgery and more constant in nature.

51. On July 26, 2014, Mr. Johnson reported to the Emergency Department of the Phelps County Regional Medical Center for right arm discoloration. Mr. Johnson was evaluated by Joaquin Guzon, M.D. ("Dr. Guzon").

52. Dr. Guzon noted Mr. Johnson's complaints of right upper extremity discoloration, lack of strength in the right arm, and numbness in the right hand. Dr. Guzon additionally noted that Mr. Johnson believed that the swelling in his chest and arm had increased.

53. Dr. Guzon ordered an upper extremity venous Doppler to rule out deep vein thrombophlebitis ("DVT"). No evidence of DVT was found and Mr. Johnson was discharged home. He was told to follow-up at the VA within one week.

54.     Mr. Johnson returned to the Columbia VAMC on August 11, 2014 for a thoracic surgery follow-up visit, where he was evaluated by John Markley, M.D. ("Dr. Markley"). Dr. Markley documented Mr. Johnson's complaints of numbness and weakness in his right hand, noting that the patient could not use a knife and fork, and had no grip strength. Mr. Johnson was additionally experiencing pain at a "6" on a 0 to 10 scale.

55.     Dr. Markley ordered PT/OT for Mr. Johnson and instructed him to keep his upcoming appointment with neurology.

56.     Mr. Johnson began physical therapy at the VAMC on August 21, 2014. Dipti Patel, P.T. documented that Mr. Johnson was experiencing decreased range of motion of the right shoulder compared to the left, decreased strength of the right rotator cuff muscles, weakness in the right hand muscles distribution, and mild tightness in the right third and fourth lumbricals.

57.     Mr. Johnson was issued an oval 8 ring to prevent contractures, several exercises with written handouts, theraputty, and an overhead pulley. A consultation was placed for non-VA care near Mr. Johnson's home. He was instructed to attend therapy once per week for four weeks.

58.     On September 10, 2014, Mr. Johnson attended an occupational therapy consultation with Kimberly Hickey, O.T.

59.     During the evaluation, Mr. Johnson reported swelling when his right hand was not elevated, and "numbness in my whole arm but I have no feeling." Mild edema was noted in the right index and middle digits upon objective assessment. Mr. Johnson was issued and fitted with a right small over-wrist isotoner glove.

60.     Mr. Johnson returned to the Columbia VAMC for a neurology consultation on September 12, 2014. He was evaluated by Dr. Lucchese and Jagkirat Singh, M.D. ("Dr. Singh").

61. Drs. Lucchese and Singh noted that Mr. Johnson reported no change since his last visit and that he was having difficulty working at his book binding company.

62. Upon physical examination, these physicians noted that Mr. Johnson had lost sensation to fine and crude touch on the medial two fingers of his right hand, both dorsal and ventral. They noted that while proprioception was intact, the motor power was 3/5 for flexors and extensors of the left wrist.

63. Providers documented their belief that the root of the brachial plexus was affected, and that an EMG would be performed to figure out the exact lesion.

64. An electro-diagnostic nerve conduction study was performed on October 6, 2014 by Carl Giacchi ("Mr. Giacchi"). Mr. Giacchi noted that Mr. Johnson's fingers were starting to curl, and that he had no feeling in the fifth finger and no grip strength.

65. The findings of the electromyography included: "abnormal right median motor amplitude with normal distal latency and conduction velocity; abnormal right ulnar motor amplitude with normal distal latency and conduction velocity; abnormal right ulnar F-wave delayed; abnormal right axillary loop delayed; absent right ulnar sensory peak latency and amplitude to the fifth finger; abnormal right medial antebrachial cutaneous peak latency with normal amplitude at the forearm; and abnormal EMG of right upper extremities showing fibrillation potentials, positive waves and decreased recruitment in C8-T1 distb nerves."

66. The impression was noted as an abnormal study with electrophysiologic evidence of a right brachialplexopathy affecting the lower trunk and C8-T1 innervated muscles. These findings were noted as "new findings compared to previous EMG."

67. Mr. Johnson continued to attend physical therapy. His motor and sensory deficits did not improve.

68. On October 30, 2014, Dr. Caron entered a telephone note into Mr. Johnson's VA medical records. Dr. Caron documented that he called Mr. Johnson because he requested a letter to receive disability, and that Mr. Johnson had been told that his nerve root was cut and would remain that way.

69. Dr. Caron noted that he had reviewed his operative note. He documented that Mr. Johnson "did require repeated exposure of the first rib because the instruments available were not sharp enough to divide the first rib. It took multiple attempts before a bone cutter sharp enough to divide the first rib was available. The neurolysis is performed after the rib is removed. I suspect any injury to the brachial plexus is from retraction and not from actually dividing the nerve roots."

70. On November 4, 2014, Dr. Lucchese authored a letter of correspondence regarding Mr. Johnson's neurology study. This document stated "I care for the patient as his neurologist. He had surgery on July 21 for a reduction of thoracic outlet syndrome. At that time he had damage to the right brachial plexus which has resulted in inability to use the right hand. This has limited his ability to perform any mechanical activities with that arm. It interferes with his ability to work. I would expect that the lesion will continue for at least 1 year, more likely around 18 months. It is questionable whether or not it will completely heal, at this time."

71. Despite physical therapy and many additional follow-up evaluations, Mr. Johnson's symptoms have persisted.

72. Mr. Johnson continues to have motor and sensory deficits to the right hand, resulting in a permanent loss of use.

73. His specific symptoms include loss of sensation to fine and crude touch, curling of and other deformity, numbness, muscle atrophy, and loss of grip strength.

74. Mr. Johnson's brachial plexus injury has seriously hindered his daily activities and forced him to change his employment.

75. Mr. Johnson has been told by his healthcare providers that his injury will not heal and is permanent in nature.

## Count One: Negligence

76. Mr. Johnson re-alleges and restates paragraphs 1 through 75 as if fully stated herein.

77. At all times relevant to this action, the agents, servants, employees, and personnel of the Defendant United States of America were acting within the course and scope of their employment in providing medical care and treatment to Mr. Johnson, a veteran of the United States Armed Forces entitled to such care and treatment.

78. The Columbia VAMC healthcare providers evaluating Mr. Johnson for thoracic outlet syndrome owed him a duty to provide him with an accurate diagnosis for his condition and a duty to recommend appropriate treatment for that condition, in accordance with the governing standards of medical care.

79. On July 21, 2014, the surgical team at the Columbia VAMC owed Mr. Johnson a duty to provide him with medical care and treatment consistent with the governing standards of medical care.

80. The surgical team owed Mr. Johnson a duty to perform the July 21, 2014 procedure within the standard of care.

81. In particular, as the surgeons, Drs. Kudav and Caron owed Mr. Johnson a duty to select the appropriate tools for the procedure and ensure that these tools were available for use.

82. The surgical team, in particular Drs. Kudav and Caron, and the Columbia VAMC deviated from appropriate standards of medical care in providing medical care and treatment to Mr. Johnson in the following respects:

   a. Negligent misdiagnosis of thoracic outlet syndrome;

   b. Negligent recommendation of the right rib resection procedure that was unnecessary for the patient;

   c. Negligent performance of the right rib resection procedure on July 21, 2014;

   d. Negligent failure to have the appropriate equipment and tools available in the operating room, including, but not limited to, a properly maintained variety of cutting tools required for thoracic surgery;

   e. Negligent failure to postpone and/or cancel the July 21, 2014 surgery due to the unavailability of appropriate and properly maintained cutting tools;

   f. Negligent selection of the Gigli saw as the bone cutting tool used in the procedure;

   g. Negligent failure to timely diagnose and treat the injuries relating to the surgery; and

   h. Committing other negligent acts and/or omissions in violation of the applicable standards of medical care that may be revealed through additional factual investigation, expert review, and/or discovery.

83. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson was caused to suffer physical injury, pain, mental anguish, and permanent physical disability. He has additionally incurred economic damages as a result of the injury and his disability.

-12-

Case 2:17-cv-04081-NKL   Document 11   Filed 07/07/17   Page 12 of 15

84. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson suffered an ulnar nerve injury.

85. As a direct and proximate result of the aforementioned negligence of the agents, servants, and/or employees of the United States at the Columbia VAMC, Mr. Johnson has suffered the following injuries:

   a. Permanent loss of use of the right lower extremity;

   b. The need for additional medical intervention;

   c. Permanent loss of sensation to fine touch in the right lower extremity;

   d. Permanent loss of sensation to crude touch in the right lower extremity;

   e. Permanent curling of and other deformity to the right lower extremity;

   f. Permanent numbness to the right upper extremity;

   g. Permanent muscle atrophy in the intrinsic muscles of the right hand and right forearm;

   h. Permanent loss of grip strength in the right hand; and

   i. Permanent nerve injury.

86. These injuries have affected Mr. Johnson's ability to perform activities of daily life, remain employed in his field of employment, and have caused a significant decrease in his overall quality of life.

87. Accordingly, Mr. Johnson claims the following damages:

   a. Compensation for the physical injury and disability suffered by Mr. Johnson;

   b. Compensation for the extreme pain, suffering, and mental anguish of Mr. Johnson;

   c. Compensation for economic losses sustained as a result of Mr. Johnson's injury;

d.  Compensation for Mr. Johnson's loss of enjoyment of life;

e.  Compensation for past and future medical expenses; and

f.  Compensation for any other damages sustained by Mr. Johnson as a proximate result of the Defendant's negligent acts.

88. For these damages, Mr. Johnson demands $5,000,000.00 (Five Million and 00/100 Dollars) in compensation.

89. Pursuant to Missouri Revised Statutes § 538.225, the written opinion of a legally qualified healthcare provider has been obtained in support of this case. The affidavit of counsel is attached hereto as **EXHIBIT A** and is incorporated herein by reference.

WHEREFORE, Mr. Johnson respectfully requests that this Court grant judgment in his favor against Defendant as prayed for above and award him such other further relief as is just and equitable under the circumstances.

Respectfully Submitted,

HARRY H. JOHNSON III

/s/ Brewster S. Rawls
Brewster S. Rawls - VSB No. 23604
Rachel P. Maryan - VSB No. 86092
RawlsMcNelis, P.C.
211 Rocketts Way, Suite 100
Richmond, VA 23231
(804) 344-0038
(804) 782-0133 – Facsimile
brawls@RawlsMcNelis.com
rprocopio@RawlsMcNelis.com
*Lead Counsel for Plaintiff*

Tim Van Ronzelen
Cook, Vetter, Doerhoff & Landwehr, P.C.
231 Madison Street
Jefferson City, MO 65101
(573) 635-7977 ext. 110
(573) 635-7414 – Facsimile
tvanronzelen@cvdl.net
*Local Counsel for Plaintiff*

**Certificate of Service**

I hereby certify that on this 7th day of July, 2017, the foregoing PLAINTIFF'S AMENDED COMPLAINT was sent via electronic mail to:

Matt Sparks
Assistant U.S. Attorney
U.S. Department of Justice
United States Attorney's Office
400 East 9th Street, Room 5510
Kansas City, Missouri 64106
matt.sparks@usdoj.gov

/s/ Brewster S. Rawls